IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Charlottesville Division

| | | |
|---|---|---|
| GLORIA S., | ) | |
|     Plaintiff, | ) | Civil Action No. 3:23-cv-00043 |
| | ) | |
| v. | ) | REPORT & RECOMMENDATION |
| | ) | |
| MARTIN O'MALLEY, | ) | By:   Joel C. Hoppe |
| Commissioner of Social Security, | ) |         United States Magistrate Judge |
|     Defendant.[1] | ) | |

Plaintiff Gloria S., appearing pro se, asks this Court to review the Commissioner of Social Security's ("Commissioner") final decision denying her request to waive overpayment of disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401–434. Compl., ECF No. 1; *see* Administrative Record ("R.") 1, 9, 12–19, ECF No. 10-1. The Commissioner's decision holds Gloria liable for $173,329.20 in DIB overpayments made from June 2003 to October 2016, R. 18, based on an Administrative Law Judge's ("ALJ") finding that Gloria "was not without fault in causing the overpayment," R. 15 (citing 20 C.F.R. §§ 404.507, 404.510a). *See* R. 14–19 (Mar. 28, 2023). The matter is before me on the Commissioner's contested motions to remand under the fourth sentence of 42 U.S.C. § 405(g). Def.'s Mot. to Remand (Feb. 9, 2024), ECF No. 18; Def.'s Am. Mot. to Remand (Apr. 18, 2024), ECF No. 24. Having carefully considered the parties' filings and oral arguments, the administrative record, and the applicable law, I respectfully recommend that the presiding District Judge grant the Commissioner's amended motion, ECF No. 24, and remand this matter to the agency for further investigation and explanation. *Radford v. Colvin*, 734 F.3d 288, 295 (4th Cir. 2013); 42 U.S.C. § 405(g). All remaining motions, ECF Nos. 12, 17, 18, may be denied as moot.

---

[1] Commissioner O'Malley is hereby substituted as the named Defendant in this action. 42 U.S.C. § 405(g); Fed. R. Civ. P. 25(d).

1

I. Background

Gloria was born in May 1953. R. 38–39, 292. In the early 1990s, she worked as a computer scientist for the Defense Intelligence Agency, *see* R. 40–41, 78, 487, 491, where she designed and implemented complex systems to secure highly sensitive information, R. 78–79, 116, 155. Around September 1991, Gloria developed a severe bacterial infection in her right knee. *See* R. 41, 289, 349–50, 400. The bacteria quickly spread to other joints and connective tissue, causing debilitating arthritis in her upper and lower extremities. *See* R. 43–45, 50, 288, 349–50. This condition forced Gloria to leave the workforce in her late thirties. *See* R. 44, 78–79. Gloria then submitted claims for two kinds of public disability benefits ("PDB") administered by two different federal agencies. *See* R. 281, 301.

In February 1992, Gloria called the Social Security Administration ("SSA") to apply for DIB under Title II. *See* R. 43, 85, 391, 399. That March, SSA approved Gloria's DIB claim based on her diagnosed "Rheumatoid Arthritis and Other Inflammatory Polyarthropathies."[2] R. 391. In 1999 or 2001, an SSA employee came to Gloria's house to conduct an in-person continuing disability review ("CDR"). SSA found that her physical disability continued and she was still entitled to DIB payments. *See* R. 53, 102, 325–29, 399–400, 405, 423. At some point, SSA should have told Gloria that she needed to report any changes in her income, including

---

[2] Gloria's doctors later discovered that the arthritis was caused by an untreated bacterial infection rather than inflammatory disease process. *See* R. 42, 103, 288, 450. Gloria has testified that she was physically "incapacitated" from September 1991 until July or August 1992. R. 49–50; *see also* R. 43–44. Her functioning slowly improved with intravenous and oral antibiotics. R. 49–50, 53, 154. By 1995 or so, she could walk again and do some basic activities of daily living. R. 50–51, 450. In 2003, Charles Jackson, M.D., opined that Gloria had "100% whole person impairment because of marked end stage changes in her hands, wrists, elbows, knees, ankles, subtalar joint[,] and feet." R. 289 (Jan. 30, 2003). "This disability [was] a direct result of infection and damage to her joints that spread from her right knee while at work and due to [a] stress reaction of a magnitude enough to cause alternation in the normal immune system." *Id.*; *see also* R. 351. Gloria suffered "progressive [joint] deformity up until March 19, 1997 when she reached maximum medical improvement." R. 289.

money received through other PDB programs, because her income could affect the amount of her monthly DIB payment. R. 44, 86, 88 (acknowledging that SSA mailed Gloria letters that "likely" included notification of the income reporting requirement); 42 U.S.C. § 424a(e); 20 C.F.R. § 404.408(e); *see, e.g.*, *Thomas v. Sullivan*, No. 90-2058, 1991 WL 4642, at *1 (4th Cir. Jan. 23, 1991) ("Both before and after the [SSA] granted him benefits, Thomas received notice that his workers' compensation benefits would affect the amount of his disability benefits."); *Taylor v. Barnhart*, No. 02cv739, 2001 WL 34614944, at *1, *3 (E.D. Va. July 11, 2001) (noting that claimant's DIB application filed in November 1993 "contained many phrases detailing the [claimant's] reporting responsibilities" and "specifically stated that . . . applying for and receiving a decision on benefits under any workers' compensation law or plan or other public benefit based on disability" might affect his entitlement to DIB under Title II (cleaned up)). Paper records from both DIB claim reviews have been purged. *See* R. 58, 85, 88, 101–02, 108, 391, 404. Thus, SSA "cannot verify that an app[lication] summary with [Gloria's] reporting responsibilities was issued." *See* R. 391.

Gloria also applied for benefits administered by the Office of Worker's Compensation Programs ("OWCP") at the Department of Labor. *See* R. 44, 105–06. In May 2003, OWCP approved her claim for benefits under the Federal Employees Compensation Act ("FECA"), 5 U.S.C. § 8102, based on a work-related psychological disability. *See* R. 379–81, 390–91, 541–42. Gloria's primary contact at OWCP was a Mr. Alston, who had just started his job as a claim examiner. R. 52, 88. Gloria has testified that Mr. Alston called her "out of the blue" one day in 2003 and "said [she's] getting benefits." R. 52; *accord* R. 105–06. He explained that FECA benefits would "go into [her] account." R. 52; *see* R. 105–06. Gloria asked if taxes would be taken out before the money was deposited. R. 52. Mr. Alston said, "there are no taxes. Don't

3

worry about taxes." *Id.* He told Gloria that she needed to notify the Office of Personnel Management ("OPM") about the FECA benefits because she had to choose between her existing Federal Employee Retirement System ("FERS") payments and these new, higher FECA payments. *Id.*; *accord* R. 88, 99–100. This "seemed logical" to Gloria, R. 106, so she "asked Mr. Alston if [she] should inform Social Security" as well, R. 104. *See also* R. 52, 88, 372. He said "no," R. 104, because "[t]hat has nothing to do with it. That's a physical claim. This is a mental claim. They're not related," R. 52. *See also* R. 88, 100, 104. From May 2003 to March 2016, Gloria received monthly PDB income under both Title II and FECA. R. 390, 399–403. She never reported the FECA benefits directly to SSA. *See* R. 112.

Title II required SSA to reduce Gloria's DIB payments by some amount to offset the income that she received under FECA. *See* 42 U.S.C. § 424a(a); 20 C.F.R. §§ 404.401(a)(4), 404.408(a)–(c); *Cannon v. Saul*, Civ. No. 19-3571, 2021 WL 486575, at *2 (D.S.C. Feb. 10, 2021) (citing 20 C.F.R. § 404.408); *Kober v. Apfel*, 133 F. Supp. 2d 868, 871–73 (W.D. Va. 2001) (citing 42 U.S.C. § 424a(a)). In March 2016, a computer match revealed that Gloria had received FECA payments in months she also received her full DIB payments. R. 390, 404. That October, an SSA employee "updated [Gloria's] SSA record retroactively by inputting [FECA] worker's compensation data." R. 390. At this point, SSA discovered that it had paid Gloria $207,691.20 in DIB from May 2003 through October 2016, when she was only entitled to $34,362.00 in DIB during that thirteen-year period. R. 541. The difference between these two amounts resulted in an $173,329.20 "entitlement overpayment" under Title II. R. 390; *see Jones v. Chater*, No. 96-2666, 1997 WL 499701, at *1 (4th Cir. Aug. 25, 1997) (discussing entitlement overpayments and waivers generally); 20 C.F.R. §§ 404.507(a)–(c), 404.510a, 404.508, 404.509, 404.512(a) (regulations governing entitlement overpayment waivers).

4

Title II requires the Commissioner to recover an overpayment by demanding a refund or adjusting the amount of other payments owed to an overpaid person. *See* 42 U.S.C. § 404(a)(1). In Gloria's case, SSA has withheld a significant portion of her monthly Retirement Insurance Benefits ("RIB") payments to recoup the DIB overpayment.[3] *See, e.g.*, R. 64, 307, 390, 400. However, Title II also instructs that "there shall be no adjustment of payment to, or recovery by the United States from, any person who is without fault if such adjustment or recovery would defeat the purpose of [Title II] or would be against equity and good conscience." 42 U.S.C. § 404(b)(1). The Commissioner will "waive collection on overpayment" in such cases. *Young v. Soc. Sec. Admin.*, No. 2:13cv63, 2014 WL 949040, at *2 (E.D. Va. Mar. 10, 2014); *see* 20 C.F.R. §§ 404.506(a), 404.512(a)–(b).

An overpaid claimant can request waiver by "giv[ing] SSA information to support his/her contention that he/she is without fault in causing the overpayment (see § 404.507) and that adjustment or recovery would either defeat the purpose of [T]itle II of the Act (see § 404.508) or be against equity and good conscience (see § 404.509)." 20 C.F.R. § 404.506(c). This two-step inquiry requires the Commissioner to evaluate all relevant evidence in the record and to make specific factual findings as to (1) whether the claimant is "without fault" in causing or accepting the entitlement overpayment, 20 C.F.R. §§ 404.507, 404.510a, and, if so, (2) whether demanding repayment would defeat Title II's purpose or would be against equity and good conscience, *id.* §§ 404.508, 404.509, 404.512. *See Cokinos v. Soc. Sec. Admin.*, No. SAG-13-2035, 2015 WL

---

[3] At the motion hearing, counsel for the Commissioner indicated that SSA recently changed how it calculates the amount withheld from a person's other benefits in order to recoup an overpayment. "As of March 25, 2024, the agency will collect ten percent (or $10, whichever is greater) of the total monthly Social Security benefit to recover an overpayment, rather than collecting 100 percent as was previous procedure." Press Release, Soc. Sec. Admin., Social Security Announces Four Key Updates to Address Improper Payments (Mar. 20, 2024), *available at* https://blog.ssa.gov/social-security-announces-four-key-updates-to-address-improper-payments. "The change applies to new overpayments." *Id.* Claimants with existing overpayments can ask the agency to lower their monthly withholding on a case-by-case basis. *Id.*

8664208, at *3–4 (D. Md. Dec. 11, 2015) (fault determination); *Glosemeyer v. Colvin*, No. 1:14cv414, 2015 WL 59432664, at *3–8 (M.D.N.C. Oct. 13, 2015) (Title II's purpose and/or equity and good conscience determination). The claimant bears the burden to prove *both* that she was "without fault" under §§ 404.507 and/or 404.510a, *and* that repayment should be waived under §§404.508, 404.509, or 404.512. *See Daniels v. Astrue,* No. PWG-09-2834, 2012 WL 5567800, at *2 (D. Md. Nov. 14, 2012) (citing *Bray v. Bowen*, 854 F.2d 685, 687 (5th Cir. 1988)).[4] "If the Commissioner determines that a claimant is at fault for the overpayment, the inquiry ends." *Id.* (citing *Garnett v. Sullivan*, 905 F.2d 778, 782 (4th Cir. 1990)).

\*

In March 2023, an ALJ rejected Gloria's request for waiver, R. 18, because she determined that Gloria "was not without fault in causing the overpayment," R. 15 (citing 20 C.F.R. §§ 404.507, 404.510a). The ALJ's "fault" determination relied on her conclusions that (1) Gloria "has an affirmative obligation to report any changes in income directly to SSA," R. 16, and (2) "there is no evidence that [Gloria] notified" SSA about the FECA benefits she received from May 2003 through March 2016, R. 14–15. *See also* R. 16. The ALJ did not make any findings as to whether Gloria knew or should have known this information was material, or whether Gloria knew or could be expected to know that her DIB payments were incorrect after June 2003. *See Ducharme v. Astrue*, Civ. No. PWG-08-2698, 2012 WL 907777, at *2 (D. Md. Mar. 15, 2012) (citing 20 C.F.R. § 404.507(b)–(c)). As to Gloria's defense that she reasonably

---

[4] On March 20, 2024, Commissioner O'Malley announced that SSA "will be reframing [its] guidance and procedures so that the burden of proof shifts away from the claimant in determining whether there is any evidence that the claimant was at fault in causing the overpayment." Press Release, Soc. Sec. Admin., Social Security Announces Four Key Updates to Address Improper Payments (Mar. 20, 2024), *available at* https://blog.ssa.gov/social-security-announces-four-key-updates-to-address-improper-payments. At the motion hearing, counsel for the Commissioner explained that SSA's new policy goal was in the very early stages and had not changed the current framework. *Accord id.* The existing "fault" regulations, 20 C.F.R. §§ 404.507, 404.510a, apply to active overpayment cases.

relied on Mr. Alston's erroneous information, *see* 20 C.F.R. § 404.510a, the ALJ said only that she "does not find that [Gloria] had reasonable cause to believe Mr. Alston was connected to the administration of benefits under [T]itle II of the Act," R. 16 (citing 20 C.F.R. §§ 404.510(b), 404.510a). She did not cite any evidence to support this conclusion. R. 16; *see Ducharme*, 2012 WL 907777, at *3–4 (citing 20 C.F.R. § 404.510a). Additionally, while the ALJ appears to have rejected Gloria's testimony that "she was unaware of her reporting obligations because she was very ill beginning in 1991," R. 15, the ALJ did not cite any supporting evidence or logically explain how she reached this conclusion, R. 15–16. Nor did she explain how she weighed any other record evidence bearing on Gloria's state of mind during the relevant time. *See Cokinos*, 2015 WL 8664208, at *3–4. In short, the ALJ's fault determination contains no credibility assessment at all. *See Afnani v. Berryhill*, No. 1:18cv554, 2019 WL 2224965, at *7 (E.D. Va. May 3, 2019). Having concluded that Gloria was not without fault in causing the $173,329.20 overpayment, however, the ALJ did not consider whether requiring Gloria to repay that amount would defeat Title II's purpose or would be against equity and good conscience. *See* R. 14. The Appeals Council declined to review the ALJ's decision, R. 1–6, and this appeal followed.

Gloria argues that the ALJ made several legal and factual errors in her decision. *See* Pl.'s Br. 3–8 (citing 42 U.S.C. § 404(b)(2); 20 C.F.R. §§ 404.509, 404.510(b), 404.511, 404.512(a)), ECF No. 13. She primarily argues the ALJ should have concluded that she was "without fault" in failing to report her FECA benefits directly to SSA because she reasonably relied on Mr. Alston's incorrect statement concerning the relationship between her DIB claim and her FECA claim. *See, e.g.*, *id.* at 4 ("I asked Mr. Alston if I should report to SSA. Mr. Alston said no, explaining that [DIB] was for a physical [disability] claim and [FECA] was for a psychological [disability] claim and the two claims are not related.") (citing 20 C.F.R. § 404.510(b)). She

7

asserts that she was suffering from a debilitating physical impairment when she first received DIB in 1992, as well as from a debilitating psychiatric or cognitive disorder when she spoke to Mr. Alston in 2003, both of which are relevant to the holistic and fact-specific "fault" determination. *See id.* at 3–4. Gloria further argues that demanding repayment would be "against equity and good conscience" because she relied on her monthly DIB income to purchase her current home in July 2006. *See id.* (citing 20 C.F.R. § 404.509). She asks this Court to grant an overpayment waiver and direct SSA to reimburse the "money taken thus far from [her] retirement for the alleged overpayment." *Id.* at 12; *see also id.* at 2–3; Pl.'s Br. in Opp'n 1, ECF No. 19.

After Gloria filed her merits brief, the Commissioner moved to remand for rehearing under the fourth sentence of 42 U.S.C. § 405(g). He agrees that the final decision should be reversed, but argues that remand is the proper remedy "[b]ecause the agency must conduct additional analysis and further develop the record in order to reach a final decision" on the merits. Def.'s Mot. to Remand 2; *accord* Def.'s Am. Mot. to Remand 2. The Commissioner further explains that "the Appeals Council will instruct the ALJ that [Gloria] is without fault with respect to the DIB overpayment. [This] finding obviates the need for further agency evaluation of the fault/no fault analysis." Def.'s Am. Mot. to Remand 1; *see* 20 C.F.R. § 404.507(a)–(c). Accordingly, the Appeals Council "will instruct the ALJ to conduct an analysis regarding whether the overpayment should be waived because" requiring Gloria to reimburse the agency "would defeat the purpose of Title II or would be against good conscience and equity." Def.'s Am. Mot. to Remand 2 (citing 20 C.F.R. §§ 404.406(d), 404.508, 404.509). The Appeals Council also will "instruct the ALJ to reevaluate, if necessary," whether SSA staff "properly and timely contacted" Gloria "to develop her retirement insurance benefits (RIB) claim, and [to]

8

reevaluate the amount of the [DIB] overpayment" based on that analysis. *Id.* at 2. Finally, the agency will stop its collection efforts while "further hearing level proceedings to determine the waiver issue" are pending. *See id.*

Gloria opposes remand. Pl.'s Br. in Opp'n 1–4. She argues that SSA already has the "evidence that [she] was misinformed" by Mr. Alston about her reporting obligations in 2003, so "there is nothing to reevaluate" for the ALJ to conclude that she was "without fault" in causing or accepting these DIB overpayments. *Id.* at 2 (citing 20 C.F.R. § 404.510(b)). She asserts that "[t]he law is very clear" that a DIB "[o]verpayment waiver is automatic" if the person relies on "misinformation from a government official," which Gloria claims is the main reason why she did not specifically tell SSA that she was receiving FECA benefits. *See id.* at 3 (citing 20 C.F.R. §§ 404.510(b), 404.512(a)). Finally, Gloria implies that the ALJ "accept[ed] the evidence and testimony" showing that she reasonably relied on Mr. Alston's misinformation, but ignored the law in order to "collect the repayment anyway." *Id.*; *see also* Pl.'s Br. 2–6, 12.

In reply, the Commissioner notes that "the agency has not determined that [Gloria's] defense that she relied on a non-agency employee's representation of her reporting duties is valid and supported by evidence [or] that 20 C.F.R. § 404.510(b) applies" in this case. Def.'s Reply 2, ECF No. 20. He also notes that this ALJ found that Gloria "was at fault in not reporting the overpayment" and therefore did not analyze "whether the overpayment should be waived because" demanding repayment "would defeat the purpose of Title II . . . or would be against good conscience and equity." *Id.* at 2 (citing R. 15–18; 20 C.F.R. § 404.506(a)). "The former analysis requires case development regarding [Gloria's] income and expenses, and the latter analysis requires further case development regarding whether and how [Gloria] changed her position for the worse based on the overpayment." Def.'s Am. Mot. to Remand 2 n.1. Further,

9

SSA may need to investigate whether its own staff "properly and timely contacted" Gloria to develop her RIB claim, which would involve gathering new evidence and recalculating "the amount of the [DIB] overpayment." Def.'s Reply 2. "Specialized agency knowledge and expertise" are required to make these determinations based on all the available evidence. *Id.* Gloria filed an unauthorized surreply brief, *see* W.D. Va. Civ. R. 11(c)(1), reiterating her objections to the Commissioner's motion to remand, ECF No. 21.

On April 22, 2024, I held a hearing on the Commissioner's motions to remand, ECF Nos. 18, 24, at which Gloria and counsel for the Commissioner appeared by telephone. Both parties ably argued their positions. Counsel explained that, "in the normal course of things," SSA would have sent Gloria clear instructions that she needed to report FECA income when she was awarded DIB in the early 1990s and when her DIB was continued in the early 2000s. Because those paper files were so old, however, they were purged sometime before SSA first discovered the FECA payments in March 2016. *See also* R. 391. Given this lack of documentary evidence, counsel argued that it would be futile for another ALJ to determine whether Gloria was in fact "aware of her duty to report [FECA] income to the agency during the relevant period," Def.'s Mot. to Remand 1. *See* 20 C.F.R. § 404.507(b)–(c). Instead, the Commissioner "will instruct the ALJ that [Gloria] is without fault with respect to the DIB overpayment. [This] finding will obviate the need for further agency evaluation of the fault/no-fault analysis," at least under § 404.507(b)–(c). *See* Def.'s Am. Mot. to Remand 1. Counsel further explained that SSA needs to develop a more complete factual record to properly evaluate Gloria's position that demanding repayment would be against equity and good conscience and, if necessary, to ensure that SSA correctly calculated the amount of her DIB overpayment. *See id.* at 2; Def.'s Mot. to Remand 2.

II. Discussion

The Commissioner seeks a "sentence four" remand in this case. Def.'s Mot. to Remand 1, (citing 42 U.S.C. § 405(g)). The fourth sentence of § 405(g) authorizes federal courts to enter "judgment affirming, modifying, or reversing the [final] decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The court's only role in reviewing such decisions is to determine whether the Commissioner's "findings are supported by substantial evidence" in the claimant's record "and whether the correct law was applied." *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002) (final decisions denying initial disability claims); *accord Jones v. Chater*, No. 96-2666, 1997 WL 499701, at *1 (4th Cir. Aug. 25, 1997) (final decisions denying overpayment waivers). "A necessary predicate to engaging" in this review "is a record of the basis for the ALJ's ruling." *Radford*, 734 F.3d at 295. "The record should include a discussion of which evidence the ALJ found credible and why, and specific application of the pertinent legal requirements to the record evidence." *Id.* "If the reviewing court has no way of evaluating the basis for the ALJ's decision, then 'the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation.'" *Id.* (quoting *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985)). The reviewing court has discretion to choose the appropriate remedy. *Carr v. Kijakazi*, No. 20-2226, 2022 WL 301540, at *4–5 (4th Cir. Feb. 1, 2022); *see also Radford*, 734 F.3d at 295; *McKinney v. Colvin*, 111 F. Supp. 3d 663, 666 (E.D.N.C. 2015).

Remand is the proper remedy here. First, while the Commissioner "will instruct the ALJ that [Gloria] is without fault with respect to the DIB overpayment," Def.'s Am. Mot. to Remand 1, the ALJ may still need to make a factual determination as to *why* she was without fault in this situation. For example, if "the facts show" that Gloria simply did not know, and "should [not] have known," that information about her FECA income was "material," 20 C.F.R. § 404.507(b),

11

then the ALJ would go on to the second step of the waiver inquiry outlined in §§ 404.508 and/or 404.509. *See, e.g.*, *Sanhueza v. Kijakazi*, No. 3:20cv106, 2021 WL 4228887, at *4–5 (W.D.N.C. Sept. 16, 2021); *Collier v. Colvin*, No. 3:16cv59, 2019 WL 8603654, at *3 (E.D. Va. Dec. 19, 2019). But, Gloria has long insisted she is without fault because she reasonably relied on Mr. Alston's erroneous advice that she did not need to report FECA income directly to SSA. *See* 20 C.F.R. § 404.510a. Section 404.510a describes a specific factual situation where "an individual is 'without fault' in an entitlement overpayment" case. *Id.* Specifically:

> Where an individual . . . accepts such overpayment [i] because of reliance on erroneous information [ii] from an official source within the Social Security Administration (or other governmental agency which the individual has reasonable cause to believe was connected with the administration of benefits under title II or title XVIII of the Act) [iii] with respect to the interpretation of a pertinent provision of the Social Security Act or regulations pertaining thereto, . . . such individual, in accepting such overpayment, will be deemed to be without fault.

*Id.* (romanettes added).[5] Section 404.512(b) provides that, "[i]n the situation[] described in § . . . 404.510a adjustment or recovery *will be waived* since it will be deemed that such adjustment or recovery is against equity and good conscience." *Id.* § 404.512(a) (emphasis added). "Thus, someone who [reasonably] relies on erroneous information from an official source meets both requirements for waiver set forth in 42 U.S.C. § 404(b): he or she is without fault, *and* recovery would be against equity and good conscience." *Gladden v. Callahan*, 139 F.3d 1219, 1223 (8th Cir. 1998) (citing 20 C.F.R. §§ 404.510a, 404.512(a)).

The prior ALJ considered Gloria's "official source" defense, but her decision states only that she "does not find that [Gloria] had reasonable cause to believe Mr. Alston was connected with the administration of benefits under [T]itle II of the Act," R. 16 (citing 20 C.F.R. §§ 404.510(b), 404.510a). Gloria's record contains inconsistent evidence on this point, *e.g.*, R. 52,

---

[5] Title XVIII relates to Medicare benefits. *See Schweiker v. Hogan*, 457 U.S. 569, 578 (1982).

85, 88, 108, and the ALJ did not explain how she weighed this evidence in reaching her conclusion. *See Viehman v. Schweiker*, 679 F.2d 223, 225 (11th Cir. 1982) (reversing and remanding denial of overpayment waiver where the court was "unable to discern whether the ALJ based his ruling on the sufficiency of the evidence presented or relied on a credibility determination of [payee's] testimony" describing the relevant circumstances); *Afnani*, 2019 WL 2224965, at *6–7; *Khandelwal v. Berryhill*, Civ. No. TMD 16-2486, 2018 WL 1583469, at *2 (D. Md. Mar. 31, 2018); *St. Holder v. Comm'r, Soc. Sec. Admin.*, Civ. No. SAG-15-666, 2016 WL 447832, at *2–3 (D. Md. Feb. 4, 2016); *Barrett v. Comm'r of Soc. Sec.*, No. 2:10cv546, 2011 WL 2462576, at *5 (E.D. Va. May 19, 2011). Determining whether § 404.510a applies in Gloria's case requires the ALJ to make specific findings after evaluating all relevant evidence in the record. *See Gladden*, 139 F.3d 1223; *Garnett*, 905 F.2d at 782. This Court cannot "engage in these fact-finding exercises in the first instance." *Fox v. Colvin*, 632 F. App'x 750, 754 (4th Cir. 2015) (brackets omitted) (quoting *Radford*, 734 F.3d at 296).

Second, because the ALJ found that Gloria "was not without fault in causing the overpayment," R. 15, she did not consider whether recovery would defeat Title II's purpose or would be against equity and good conscience, *see* R. 14. Recouping an overpayment defeats Title II's purpose if it would "deprive a person of income required for ordinary and necessary living expenses" including food and clothing, housing costs, insurance, taxes, and medical expenses. *See* 20 C.F.R. § 404.508(a)(1)–(2). "This depends upon whether the person has an income or financial resources sufficient for more than ordinary and necessary needs, or is dependent upon all of his [or her] current benefits for such needs." *Id.* § 404.508(a). "Recovery of an overpayment is against equity and good conscience if an individual [c]hanged his or her position for the worse or relinquished a valuable right because of reliance upon a notice that a

13

payment would be made or because of the overpayment itself." *Id.* § 404.509(a)(1) (emphasis and parentheticals omitted). Gloria argues that she "changed her position for the worse" in reliance upon the DIB overpayments because in July 2006 she used that monthly income to obtain a mortgage on her current home. Pl.'s Br. 4; *see also* R. 60, 161, 278, 286, 307, 358; 20 C.F.R. § 404.509(a)(1) (example 1). Her monthly mortgage payment was $1,902.35 in 2008–2009. *See* R. 286, 307. Gloria maintains that she "never would have bought a house with such a high mortgage" had she "known that [she] was not entitled to" these DIB payments. R. 358; *see also* R. 111. After SSA applied the FECA offset in November 2016, Gloria lost over $1,000 in monthly income. *See* R. 64, 307, 390, 400. Determining whether recovery should be waived under §§ 404.508 or 404.509 requires the ALJ to apply specific regulatory factors to the record evidence, which no ALJ has done in Gloria's case. *See Day v. Sec'y of Health & Human Servs.*, 519 F. Supp. 872, 878 (D.S.C. 1981). This Court cannot make that determination in the first instance. *See Radford*, 734 F.3d at 296. Additionally, while Gloria's "financial circumstances are not material to a finding of against equity and good conscience," 20 C.F.R. § 404.509(b), such information may still be relevant to a determination that she "changed her position for the worse" or "relinquished a valuable right" in reliance on her full DIB payments. *See Glosemeyer*, 2015 WL 59432664, at *7 (citing *Cucuzzella v. Weinberger*, 395 F. Supp. 1288, 1298 (D. Del. 1975)).

   Finally, counsel for the Commissioner represents that SSA may need to investigate if its own staff "properly and timely contacted" Gloria to develop her RIB claim, which would involve gathering new evidence and recalculating "the amount of the [DIB] overpayment." Def.'s Reply 2; *see* R. 292, 137–38, 142, 541. "Specialized agency knowledge and expertise" are required to make these determinations based on all the available evidence. Def.'s Reply 2.

### III. Conclusion

For the foregoing reasons, I respectfully recommend that the presiding District Judge **GRANT** the Commissioner's amended motion to remand, ECF No. 24, **REVERSE** the Commissioner's final decision dated March 28, 2023, **REMAND** the matter for rehearing under the fourth sentence of 42 U.S.C. § 405(g), and **DISMISS** the case from the court's active docket. All remaining motions, ECF Nos. 12, 17, 18, may be denied as moot.

### Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14 day period, the Clerk is directed to transmit the record in this matter to the presiding United States District Judge.

The Clerk shall serve certified copies of this Report and Recommendation to the pro se Plaintiff and counsel for the Commissioner of Social Security.

ENTER: April 25, 2024

Joel C. Hoppe
United States Magistrate Judge